IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN GILSRUD and TIMOTHY GILSRUD, | ) ) ) | 2:20-cv-659 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) ) | |
| HIGHMARK BLUE SHIELD, | ) ) | |
| Defendant. | ) | |

# COMPLAINT

1. Plaintiffs Karen Gilsrud ("Mrs. Gilsrud") and Timothy Gilsrud ("Mr. Gilsrud"), bring this action against Defendant Highmark Blue Shield ("Highmark") for violation of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et. seq.* ("ERISA"). Mr. and Mrs. Gilsrud seek equitable remedies, costs and attorneys' fees associated with this action, and penalties, as provided by ERISA.

## Parties

2. Plaintiffs Mr. and Mrs. Gilsrud are residents of Minnesota.

3. Defendant Highmark is an independent licensee of the Blue Cross and Blue Shield Association. Highmark is a registered mark of Highmark Inc., is an affiliate and/or subsidiary of Highmark Health, and is headquartered in this District at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222-3099.

4. Upon information and belief, Highmark was the medical claims administrator for The Bon-Ton Stores, Inc.'s employer-sponsored medical plan, the "PPO Blue Plan" (hereinafter "the Plan").

5. At all relevant times, Mr. Gilsrud was a beneficiary of, and participant in, the Plan, through his wife, Mrs. Gilsrud's employer, Herberger's. Upon information and belief, Herberger's was a wholly-owned subsidiary of The Bon-Ton Stores, Inc.

6. Upon information and belief, The Bon-Ton Stores, Inc. PPO Blue Plan terminated in August 2018 as a result of bankruptcy proceedings filed by The Bon-Ton Stores, Inc. and its affiliated stores.

7. Upon information and belief, the Plan is an employee welfare benefit plan regulated by ERISA and is self-funded. Upon further information and belief, Highmark is the Claims Administrator for the Plan, it has been delegated sole decision-making authority under the terms of the Plan, and is a fiduciary within the meaning within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) and/or is a functional fiduciary under ERISA.

8. At all relevant times, Mr. Gilsrud was eligible for benefits under the Plan.

9. Upon information and belief, the Plan's medical coverage includes surgical and inpatient hospital services.

## Jurisdiction and Venue

10. The Defendant is subject to personal and subject matter jurisdiction under 29 U.S.C. § 1132 (e) and (f) in the Commonwealth of Pennsylvania, in that the Defendant's breach of its ERISA obligations took place in this District. Further, upon information and belief, at all times relevant to the allegations herein, Defendant's principal place of business was in this District.

11. This Court has federal question jurisdiction under 29 U.S.C. § 1132 (e)(1) and 28 U.S.C. § 1331 because Plaintiffs' claims arise under ERISA, 29 U.S.C. § 1001, et seq.

12. Venue in this Court is proper pursuant to 29 U.S.C. § 1132 (e)(2) and 28 U.S.C. § 1391(b) and (c).

**Factual Allegations**

**Mr. Gilsrud's Hospitalization and Surgical Services**

13.     On February 7, 2018, Mr. Gilsrud was not feeling well and sought medical assistance in Alexandra, Minnesota where an electrocardiogram (EKG) was performed. Based on the EKG results, Mr. Gilsrud was referred to a cardiologist, Dr. Joe Nguyen at CentraCare in St. Cloud, Minnesota.

14.     Dr. Nguyen examined Mr. Gilsrud the following day and performed additional tests. Test results indicated that one of Mr. Gilsrud's arteries was blocked over 99 percent and two arteries, over 70 percent.

15.     Early February 9, 2018, Mr. Gilsrud was admitted to St. Cloud hospital and underwent cardiac surgery performed by Dr. Thom Dahle. Hospital records indicate that Mr. Gilsrud was considered a "high risk" case and that the surgery was "complex." An impella left ventricular support device was used to hold Mr. Gilsrud's heart while placing the stents; the impella was removed after the stents were inserted.

16.     Dr. Dahle was unable to perform right coronary artery intervention because of the amount of contrast dye used for diagnosis and the surgery itself on Mr. Gilsrud.  Accordingly, a second surgery was scheduled to insert the final stent.

17.     Because of the seriousness of Mr. Gilsrud's condition and need for observation, he remained in the Intensive Care Unit overnight, following surgery. Mr. Gilsrud was discharged from St. Cloud Hospital on February 10, 2018.

18.     On February 14, 2018, Mr. Gilsrud had his second procedure to insert the remaining stent in his heart.

**Highmark's Claims Administration**

19. On February 19, 2018, Mr. Gilsrud received from Highmark a letter dated February 12, 2018 informing him that his February 9th surgery was not covered by his medical insurance. Highmark had determined that Mr. Gilsrud initial heart surgery was not medically necessary, notwithstanding approving and paying for his follow up surgery on February 14, 2018 to insert a remaining valve stent.

20. The Plan defines medical necessity as medical services that a provider, exercising prudent clinical judgment, would provide a patient for the purpose of preventing, evaluating, diagnosing or treating an injury or illness. The treatment must be in accordance with generally accepted medical standards, clinically appropriate and considered effective, not primarily for convenience and not more costly than an alternative service.

21. Highmark's February 12, 2018 letter denial, however, cited to "InterQual Subset: Acute Adult Subset: General Surgical" guidelines as a basis for denying Mr. Gilsrud's surgical claim; the letter's quoted language stated that Mr. Gilsrud's inpatient admission could have been provided under "ambulatory designation" (e.g. same day surgery) with "post procedure overnight recovery in a facility." Highmark's seemingly contradictory denial basis failed to explain in any way whatsoever how Mr. Gilsrud's medical diagnosis, urgent medical needs and risky procedure could have been addressed in a day surgery center with overnight recovery in a "facility." Highmark's claims decision appeared to ignore the fact that Mr. Gilsrud required hospitalization for stabilization and observation following his cardiac procedure. Moreover, Highmark did not suggest a "facility" where the procedure should have been performed.

22. The same day that she received Highmark's denial, Mrs. Gilsrud contacted Highmark via telephone and spoke with a representative identified as "Erin." Erin confirmed the denial and informed Karen Gilsrud that St. Cloud Hospital was also sent this information. Erin

instructed Mrs. Gilsrud that St. Cloud Hospital could request a "peer to peer" review of Highmark's denial and that Highmark's correspondence to the hospital included specific appeal information on how St. Cloud Hospital could appeal the denial on Mr. Gilsrud's behalf. Erin did not inform Mrs. Gilsrud that the Gilsruds could appeal the denial or discuss any details for them to take steps in a member appeal.

23. That same day, Mrs. Gilsrud contacted St. Cloud Hospital to pursue the provider appeal. During her call, Mrs. Gilsrud was informed that the hospital had not yet received a denial letter from Highmark or any information related to the denied claims for Mr. Gilsrud's February 9, 2018 surgery.

24. On March 19, 2018, Karen Gilsrud again contacted St. Cloud Hospital to determine if they received information from Highmark about the denied surgery claims. Again, the hospital indicated they had not received any information from Highmark but would send Highmark the necessary medical records or whatever was needed to assure payment.

25. In early to mid-June 2018, Mrs. Gilsrud contacted St. Cloud Hospital about Highmark's denied surgery claims for Mr. Gilsrud. This time, approximately four months after the date of the denial letter, the hospital indicated they had received the denial letter from Highmark, but had not yet sent Highmark any medical records. Following the call with the hospital, Karen Gilsrud contacted Highmark and obtained its fax number. Karen Gilsrud then called back St. Cloud Hospital and provided them Highmark's fax number for sending in Mr. Gilsrud's medical records. St. Cloud Hospital confirmed it would send in Mr. Gilsrud's medical records.

26. On September 11, 2018, the Gilsruds received a second letter from Highmark indicating that they could no longer appeal the denied claims. The correspondence claimed that the 180-day appeal period had lapsed and it was too late.

5

27. In response to this correspondence, Karen Gilsrud contacted Highmark and was informed Highmark never received Mr. Gilsrud's medical records. During this telephone call, Karen Gilsrud learned the fax number provided by Highmark in June 2018 was incorrect. Highmark again informed Karen Gilsrud that St. Cloud Hospital could appeal the denial on their behalf.

28. That same day, St. Cloud hospital contacted Blue Cross Blue Shield's (hereinafter BCBS) home plan in Minnesota and was told that the hospital could appeal the denied claims as a provider and had 365 days in which to do so.

29. On September 11, 2018, St. Cloud also sent BCBS of MN detailed records related to Mr. Gilsrud's surgery and hospital stay. The hospital was informed it could take up to 60 days to process.

30. On November 28, 2018, Karen Gilsrud contacted St. Cloud hospital again, regarding their appeal. As of that date, the hospital had heard nothing from Highmark or BCBS of MN, the home plan.

31. That same day, November 28th, Karen Gilsrud contacted Highmark via telephone. The Highmark representative, "Bill," indicated that Mr. Gilsrud's St. Cloud hospital records were received on September 20, 2018 and that on September 24, 2018 they were reviewed. Bill stated that Highmark did not believe the medical records supported medical necessity for Mr. Gilsrud's initial heart surgery. Neither Mr. Gilsrud nor St. Cloud Hospital were ever informed of Highmark's second decision in writing or via telephone.

32. After the call, Karen Gilsrud contacted St. Cloud Hospital and was informed they would contact Highmark.

33. On December 10, 2018, Karen Gilsrud spoke to the billing department at St. Cloud Hospital, and they suggested obtaining a letter of medical necessity from Mr. Gilsrud's physician.

34. On December 12, 2018, Karen Gilsrud contacted Highmark and spoke to a representative identified as "Wendy." Wendy informed Karen Gilsrud that due to company's liquidation, all medical claims had to be resolved by November 30, 2018. At this point, the Gilsruds were informed they had no options for review or payment of the surgical/hospital claim. Karen Gilsrud again asked if the hospital could pursue the appeal, since she was told they had 365 days for a claims appeal. Wendy indicated that she would look into this and get back to Mrs. Gilsrud.

35. On December 13, 2018, Highmark's representative "Wendy" left a message for Karen Gilsrud apologizing for the Gilsrud's inability to further appeal the surgical claims due to the Plan being cancelled. In the phone message, Wendy acknowledged Karen Gilsrud's numerous calls to Highmark in an attempt to appeal the denial and resolve the claim.

36. On December 11, 2019, Plaintiffs, through counsel, sent a letter to Highmark requesting copies of all Plan documents, as required by 29 U.S.C. § 1024(b)(4), and a copy of the Gilsruds' claim file, as required by 29 C.F.R.§ 2560.503-l(h)(2)(iii).

37. Plaintiffs received no response to this letter until February 12, 2020, when a Highmark representative contacted Plaintiffs' counsel. In subsequent conversations, Highmark's representatives: stated that coverage was denied because there was no precertification, notwithstanding that Mr. Gilsrud had an urgent need for medical intervention, but indicated that there could be an authorization after the fact; suggested that the claim could be reconsidered; stated that Highmark could not provide the claim file without a subpoena, notwithstanding the requirements of 29 C.F.R.§ 2560.503-l(h)(2)(iii); made confusing statements as to what

7

department was responsible for responding to requests under 29 C.F.R.§ 2560.503-l(h)(2)(iii); and otherwise refused to fulfill its obligation to provide the claim file.

38.     In an email dated April 14, 2020 from Highmark's counsel, Highmark refused to provide the requested information, incorrectly stating that it was not obligated to comply with Plaintiffs' request because they did not timely file an appeal and claiming that a letter was sent informing the member of the lateness of the appeal request on January 11, 2019.

39.     Plaintiffs never received a January 11, 2019 letter.

40.     The actions of Defendant, as outlined above, have caused actual harm to Plaintiffs in the form of denial of payment for medical services rendered totaling approximately $148,000.00.

**COUNT I**
**Claim for Appropriate Equitable Relief**
**Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**

41.     Plaintiffs incorporate by reference the foregoing paragraphs as if set forth at length herein.

42.     The ERISA § 502(a)(3), 29 U.S.C. §1132(a)(3), provides that a civil action may be brought by a plan participant or beneficiary to obtain appropriate equitable relief to redress violations of ERISA, including breach of fiduciary duty, or the terms of a plan.

43.     Plaintiffs are participants and/or beneficiaries in the Plan.

44.     Highmark had sole decision-making authority, it administers the terms of the Plan, including appeals, and it renders coverage decisions to Plan participants and beneficiaries. Therefore, Highmark is a fiduciary for the Plan within the meaning of 29 U.S.C. § 1002(21) in that it exercised discretionary authority or discretionary control respecting management of the Plan and management or disposition of its assets and had discretionary authority or discretionary responsibility in the administration of the Plan.

45.     ERISA § 404, 29 U.S.C. § 1104(a)(1), requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries and … (D) in accordance with the documents and instruments governing the plan … ."

46.     Further, ERISA § 503, 29 U.S.C. § 1133 requires that every employee benefit plan must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

47.     Highmark violated ERISA § 503, 29 U.S.C. § 1133, and 29 C.F.R. 2560.503-1, the Department of Labor regulations thereunder, and failed to provide a full and fair review by the appropriate named fiduciary, by *inter alia*, misinforming Plaintiffs of the steps they needed to take to appeal the denial of coverage, failing to provide timely notice of its decisions; causing delay in the submission of information by providing an incorrect fax number; and, upon information and belief, failing to consider all of the medical information relevant to the claim.

48.     Highmark breached its fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, insofar as it failed to discharge its duties with respect to the Plan solely in the interest of Plaintiffs, participants and/or beneficiaries under the Plan, for the exclusive purpose of providing benefits to participants and beneficiaries, it failed act in accordance with the documents and instruments governing the Plan, and it failed to provide a reasonable opportunity to Plaintiffs for a full and fair review as required by ERISA § 503, 29 U.S.C. § 1133.

49.     In addition, the common law of trusts can be used to define the general scope of a fiduciary's authority and responsibility.  Accordingly, a breach of fiduciary duty may be

9

premised on the failure of a fiduciary, who is aware of the beneficiary's status and situation, to convey complete and accurate information material to the beneficiary's circumstance, even if that information comprises elements about which the beneficiary has not specifically inquired.

50. An ERISA fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed. This responsibility encompasses not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.

51. Highmark breached its fiduciary duties to Plaintiffs, *inter alia*, by:

(a) Failing to convey complete, thorough and accurate information that was material to the appeal;

(b) Failing adequately to respond to Plaintiffs' requests for information;

(c) Delaying notice of the denial of benefits to St. Cloud, thus delaying St. Cloud's provision of information to Highmark to support the appeal;

(d) Providing to Plaintiffs an incorrect fax number to which St. Cloud could submit records to support the appeal, thus delaying the appeal until after termination of the Plan;

(e) Failing to provide adequate appeal procedures for the resolution of Plaintiffs' claim;

(f) Failing to timely inform Plaintiffs of their rights to appeal before the termination of the Plan due to the bankruptcy of the Plan sponsor;

(g) Failing to apply the terms of the Plan when administering Plaintiffs' claim for surgical services; and

(h) Failing to otherwise deal fairly and honestly with Plaintiffs, during and after the claim process.

51.     Plaintiffs detrimentally relied on Highmark's representations regarding how to pursue of the appeal.

52.     As a result of Highmark's breach of fiduciary duties, Plaintiffs suffered actual harm, in that they are being held responsible for the excess bill his medical provider charged them, as well as resulting costs and expenses, for services covered under the Plan.

## COUNT II
### Claim for Penalties Pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c)(1)

53.     Plaintiffs incorporate by reference the foregoing paragraphs as if set forth at length herein.

54.     Pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), a plan administrator "shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest . . . the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."

55.     Pursuant to ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1), an administrator who fails or refuses to comply with a request for any information which the administrator is required to furnish under the statute by mailing the material requested within 30 days after such request "may in the court's discretion be personally liable . . . in the amount of up to [$110] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."

56.     On December 11, 2019, Plaintiffs, through counsel, sent a letter to Highmark requesting copies of all Plan documents, as required by 29 U.S.C. § 1024(b)(4). At this time, Plaintiffs had no documents from which to determine the name and address of the Plan administrator and had only been dealing with Highmark.

57. To date, Defendant Highmark has refused to furnish the requested documents or otherwise advise Plaintiffs as to the person able to respond to such a request.

58. Under § 502(c), to 29 U.S.C. § 1132(c), Defendants should be held personally liable for penalties of up to $110 per day from January 10, 2020 (which is 30 days after the request) and continuing, for their failure to furnish Plan documents in accordance with its obligations under ERISA.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff requests that this Court grant him the following relief in this case:

1. A finding in favor of Plaintiff against the Defendant;

2. Equitable remedies in the form of surcharge, or such other form as the Court may find appropriate, in the amount of $148,000.00 (medical expenses not covered by Highmark), or such other amount as is proven by the evidence;

3. Prejudgment and post-judgment interest;

4. Plaintiff's reasonable attorneys' fees and costs;

5. Penalties of $110 per day from January 10, 2020 to the date of judgment; and

6. Such other relief as this court deems just and proper.

Dated:  May 5, 2020                               *s/ Tybe A. Brett*
                                                             Tybe A. Brett, Esquire
                                                             PA ID 30064
                                                             Email: tbrett@fdpklaw.com

                                                            **FEINSTEIN DOYLE PAYNE**
                                                             **& KRAVEC, LLC**
                                                             Law & Finance Building, Suite 1300
                                                            429 Fourth Avenue
                                                            Pittsburgh, PA 15219
                                                           Ph.: (412) 281-8400
                                                           Fax: (412) 281-1007

13

**WROBEL & SMITH, PLLP**

*s/ Elizabeth I. Wrobel*
   Elizabeth I. Wrobel MN #0271755
   Email:  elizabeth@wrobelsmithlaw.com

Mark A. Smith, MN #0272140
Email:  mark@wrobelsmithlaw.com

**WROBEL & SMITH, PLLP**
1599 Selby Ave., Suite 105
St. Paul, MN 55104
Telephone:  651-925-6658
Fax:  888-865-4347

(Motion for admission *pro hac vice* to be filed)

**ATTORNEYS FOR PLAINTIFFS**